467 So.2d 790 (1985)
H & W ENTERPRISES, INC., a Corporation, Robert S. Hillard, James W. Hendrick, and Otis K. Wiggins, Appellants,
v.
Christine ELLIS, Kimberly Benner and Julie Nicely, a Partnership, d/b/a CKJ, Appellees.
H & W ENTERPRISES, INC., et al., Appellants,
v.
SILVEX CORPORATION, Appellee.
Nos. AZ-86, AZ-114.
District Court of Appeal of Florida, First District.
April 23, 1985.
Steven R. Scott, of Maxwell and Scott, Jacksonville, for appellants.
James A. Fischette, of Fischette, Parrish, Owen and Held, Jacksonville, for appellees.
BARFIELD, Judge.
This action arises from claims for breach of contract. The contracts are leases for certain real property and manufacturing equipment.
Dexter Benner was president of Silvex Corp., which was involved in reclaiming silver from photographic negatives. The process involves burning the negatives; silver is then smelted from the ash. Silvex operated in Jacksonville in the early 1970's *791 but relocated to a rural area in St. Johns County in 1977, apparently because of difficulties in complying with air pollution standards in the city. CKJ, a partnership of Mr. Benner's three daughters, owned the land and building in St. Johns County; Silvex owned the incinerators and other equipment necessary to operate the business.
In the spring of 1981, Benner was approached by Otis Wiggins. Wiggins told Benner that he was negotiating the purchase of 80,000 pounds per month of x-ray film from Italy and that he wanted Benner to process it for him. Benner declined and referred Wiggins to some other processors. Wiggins returned a few weeks later and expressed a desire to purchase the Silvex operation. When Wiggins revealed that he had no cash, the parties agreed to a lease arrangement. Wiggins formed H & W Enterprises, Inc. and leased the real property from CKJ for $4,000 per month and the equipment from Silvex at $2,000 per month. The leases were for three years commencing August 1, 1981, and the Silvex lease included an option to buy. They were guaranteed by Wiggins, Robert Hilliard, and James Hendricks.
Benner testified that he opened up his corporate records, including his records regarding his dealings with the Florida Department of Environmental Regulation (DER), to Wiggins for inspection. Wiggins told Benner that he had spent the prior year with a silver recovery firm in Atlanta that used equipment very similar to that of Silvex. At trial, Wiggins noted that this was the "start-up" phase and his experience with operation of such a plant was minimal.
There was also evidence that prior to execution of the leases, Wiggins had two consultants come in and look over the Silvex operation. One was a person from Tennessee who had been in the industry for many years. The other was an individual who sold Silvex the incinerators.
H & W's problems with DER began on August 14. At that time, Bob Shirley, who is a field inspector for the agency, told Mr. Wiggins that he was violating the pertinent Florida air quality standards and the matter would have to be corrected. Wiggins told Benner who replied that the matter would be taken care of. The agency returned on September 29 and found the situation to be worse. A letter of that date was sent to Benner advising him of possible penalties for continued noncompliance. Benner called Wiggins to discuss the problems.
Meanwhile, H & W's Italian film deal was apparently not developing. Wiggins told Benner of his cash flow problems and Benner agreed, in December of 1981, to temporarily reduce H & W's rent.
Another test of the plant's air pollution was conducted in January of 1982. Benner contracted with a private engineering firm and DER was notified. Mr. Shirley observed the initial portion of the tests and there was a substantial violation. Benner claims there was a valve malfunction which was corrected and a test later that day by the private firm showed compliance. Shirley, however, had left before that point. Wiggins then hired his own consultant who came out and observed the equipment and told him that it would not do the job he was attempting to do.
Silvex's permit to operate from DER expired at the end of May, 1982. On the 13th of the month, Wiggins and Benner submitted a renewal application to DER. On May 19th, DER wrote back requesting further information.
On June 1, 1982, Wiggins called Benner and told him he was losing money and wanted out. They agreed to meet and inventory the equipment and did so on June 6th. Most of the equipment was sold within two weeks (Silvex was having its own cash flow problems, primarily due to H & W's nonpayment of rentals).
The CKJ building was designed specifically for this operation and Benner contacted 12 to 14 of his competitors to see if he could rent it out for the purpose for which it was intended. When he could not, he converted it to a conventional warehouse *792 and rented it for $640 per month beginning January 1984.
CKJ and Silvex then brought their actions against H & W and the guarantors to recover rent for the remainder of the lease terms. Silvex's claim was ultimately reduced to $10,000 for five months' unpaid rent prior to sale of the equipment. CKJ's claim at the time of the trial was $86,080: $4,000 per month for 22 months, $88,000, less $1,920 mitigation ($640 X 3 months). In their answers, the defendants raised affirmative defenses based on the fraudulent inducement, impossibility of performance, wrongful eviction and acceptance of surrender. A counterclaim grounded in fraud was also filed. The cases were consolidated and a two-day jury trial was held in Jacksonville in March of 1984. In addition to the above, the following evidence and rulings from the trial are relevant to this appeal.
Benner testified that he moved two incinerators from Jacksonville to St. Johns County and upgraded them, increasing the size of their afterburners. He also added a third, larger, incinerator of the same type at that time. He stated that he only had two warnings from DER in his five years in St. Johns, one of those concerned a late report, and that he had never gotten a citation.
Robert Shirley, DER's investigator, stated that his file on Silvex showed notations of four visible emission violations in 1977, 1 in 1978, 3 in 1979, and 2 or 3 in 1981. Apparently, Shirley personally told Benner about some or all of these problems and asked him to correct them, but there were no reports or correspondence sent to Silvex (thus, Benner concealed no written material when he provided the files to Wiggins.) It is also undisputed that DER's records showed no Silvex violations for approximately two years prior to the lease negotations.
The defense proffered the testimony of an environmental engineer as to Silvex's air quality problems while operating in Jacksonville in 1974 through 1977. Objection to this testimony was sustained.
Wiggins testified that Benner told him the plant worked great for recovering silver. He discovered, however, that in order to recover enough silver, the incinerators had to be operated at a relatively low temperature. This resulted in visible emissions. When the incinerators were operated at a high enough temperature to comply with DER's air quality standards, so much silver was lost that the business operated at a loss.
Defendant offered two experts who opined that the Silvex incinerators were only suitable for burning trash and could not conform to air quality standards while making a profit in silver recovery. They described other devices with different designs which are specifically intended for this type of operation and which will recover silver and produce an acceptable waste product.
In rebuttal, appellees offered the testimony of the individual who worked for both Silvex and H & W as plant operator. He stated that when Wiggins' engineer came out for the final test, Wiggins told him not to control the pollution (implying Wiggins wanted bad results as an excuse to get out of the lease.) He also testified that H & W was in serious financial trouble at the end.
The jury returned verdicts of $10,000 for Silvex and $86,080 for CKJ, and against H & W on its counterclaims. The final judgments included prejudgment interest and attorney fees.
Appellants raise five issues, only one of which we find necessary to discuss in our disposition of this appeal. While we find that the performance levels of the trial attorneys with regard to jury instructions and other matters pertaining to four of the five issues were less than exemplary, we do not find reversible error there. Among the practices we condemn is the use of "finding" instructions commencing "If you find... ."
The instructions given by the court concerning fraudulent misrepresentation are error, however, and require reversal and a *793 new trial. Appellants are correct that the court's instruction was a misstatement of Florida law. The instruction given to the jury as to fraud was:
If you find that the subject matter of the alleged misrepresentations made by Mr. Benner were available and open to inspection to Mr. Wiggins and Mr. Wiggins did not avail himself of this opportunity, then he cannot be heard to say he was deceived, and you must find against H & W Enterprises, Inc., on its counterclaim.
In Besett v. Basnett, 389 So.2d 995 (Fla. 1980), the Supreme Court, relying on Restatement (Second) of Torts sections 540 and 541 (1976), adopted a rule where the recipient of a misrepresentation is not required to make an investigation unless the falsity is known or obvious.[1] It is possible to overlook this error as harmless since it dealt with a matter which was not an issue before the jury and appellants did not request an appropriate instruction.[2]Camp Phosphate Co. v. Stokes, 41 So.2d 340 (Fla. 1949); Fla.R.Civ.P. 1.470(b). However, we perceive it the obligation of the court to tell the jury charged with deciding a case what law does apply to the facts and issues before them.
It was undisputed that Wiggins hired two consultants and he and the consultants thoroughly investigated Silvex's physical plant and records prior to signing the leases. The proper law to be applied in this circumstance is covered by section 547 of the Restatement:
Recipient Relying on His Own Investigation.
(1) Except as stated in Subsection (2), the maker of a fraudulent misrepresentation is not liable to another whose decision to engage in the transaction that the representation was intended to induce is not caused by his belief in the truth of the representation but is the result of an independent investigation made by him. (2) The fact that the recipient of a fraudulent misrepresentation is relying upon his own investigation does not relieve the maker from liability if he by false statements or otherwise intentionally prevents the investigation from being effective.
Neither party proposed an instruction based on this section or any other which reflects the facts of this case, i.e., the recipient and his agents conduct an investigation. The court gave no instruction which provided the jury with any law related to the facts of this case.
The judgment of the trial court therefore is REVERSED and this cause REMANDED for a new trial.
SMITH and ZEHMER, JJ., concur.
NOTES
[1] Appellees specifically relied on Beagle v. Bagwell, 169 So.2d 43 (Fla. 1st DCA 1964), cert. denied, 174 So.2d 32 (Fla. 1965), as authority for the instruction which they proposed and which the trial judge accepted. Beagle relied on Potakar v. Hurtak, 82 So.2d 502 (Fla. 1955) in reaching its conclusion. The Besett court expressly receded from Potakar and its progeny.
[2] Appellants' requested instruction read:

If you believe from the evidence that there was a fraud committed, by active deceit or by use of any artifice or deception, and that by such artifice and deception the counterplaintiff was lulled into a false sense of security, the counterdefendant is liable for its fraud even though the information might have been as accessible to the counterplaintiff as it was to the counterdefendant. Therefore, each of the parties to the contract must take care not to say or do anything tending to impose upon the other.
We find this instruction no more representative of the facts in evidence than the one given.